## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RAYMOND M. PFEIL AND
MICHAEL KAMMER,
Individually And On Behalf Of
All Others Similarly Situated,

                                           CASE NO. 09-CV-12229

        Plaintiffs,

                                            HON. DENISE PAGE HOOD

v.

STATE STREET BANK AND TRUST
COMPANY,

        Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT,
## DENYING PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT
## and
## DISMISSING ACTION

## I.  BACKGROUND/FACTS

This matter is on remand from the Sixth Circuit Court of Appeals pursuant to

an opinion issued on February 22, 2012. *Pfeil v. State Street Bank and Trust Co.,* 671

F.3d 585 (6th Cir. 2012).  The mandate issued on April 5, 2012.  The Sixth Circuit

reversed the Court's September 30, 2010 judgment and order granting Defendant State

Street Bank and Trust Company's ("State Street") Motion to Dismiss.  (Doc. Nos. 39,

40)

Plaintiffs Raymond M. Pfeil and Michael Kammer ("Plaintiffs") filed the instant suit against State Street pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, individually and on behalf of plan participants in and beneficiaries of General Motor Corporation's ("GM") two main 401(k) plans, the General Motors Savings-Stock Purchase Program for Salaried Employees ("Salaried Plan") and the General Motors Personal Savings Plan for Hourly Employees ("Hourly Plan") (collectively, "Plans"). (Complaint, ¶ 1) The one-count Complaint alleges a breach of fiduciary duty by State Street, as an independent fiduciary, for failure to prudently manage the Plans' assets, in violation of Section 404 of ERISA.

The Plans are defined contribution profit sharing plans, referred to as 401(k) plans. The benefits each participant receives are based on the amount of contributions in the participant's account and the investment performance of those contributions. (Complaint, ¶¶ 1, 3-4) The Plans offered several investment options, including mutual funds, non-mutual fund investments and the GM Common Stock Fund. (Salaried Plan, Art. I, § 5; Hourly Plan Art. VII, § 7.01(a)) Contributions to the Plan are invested "in accordance with the Employee's election." *Id.* If an employee does not elect an option, the investments are placed in the Pyramis Strategic Balanced Fund,

not the GM Stock Fund.  (Salaried Plan, Art.  1, §§ 5(C), (D) and 6; Hourly Plan, Art.

VII, § 7.01(a))  Plan participants may change the allocation of the assets in their Plan

accounts between several options "on any Business Day of the month" up to "100%."

(Salaried Plan, Art.  I, § 8(B); Hourly Plan, Art.  VII, § 7.01(d)(ii)).

The GM Common Stock Fund "is intended to be a separate stock bonus plan

and employee stock ownership plan ("ESOP") satisfying the requirements of Section

401(a), certain subsections of 409, and Section 4975(e) of the Code."  (Salaried Plan,

Art.  III, p.  70; Hourly Plan, Art.  X, § 10.01, p.  80) The purpose of the ESOP is "to

enable Participants to acquire an ownership interest in General Motors and is intended

to be a basic design feature" of the Plans.  *Id.*  The ESOP funds "shall be invested

exclusively in GM $1-2/3 par value common stock ... without regard to (i) the

diversification of assets, (ii) the risk profile of investments in GM [common sock]."

*Id.*

On June 30, 2006, State Street and GM entered into an engagement letter which

allowed State  Street to be the Fiduciary and Investment Manager for the Company

Stock Fund.  (Complaint, ¶ 2)  Under the Agreement, State Street was responsible to

exercise its judgment and discretion to determine whether to continue offering the

Company Stock Fund investment option.  The Agreement states, "State Street will

exercise independent discretionary judgment in the performance of its obligations

3

hereunder in accordance with the fiduciary requirements set forth in ... ERISA, subject to the statement of Company Intent in Section 4 hereof."  (Agreement, pp.  2-3)
Section 4 provides:

> The Company confirms to State Street that it is the Company's intent in its settler capacity, that the Company Stock Fund continue to be invested exclusively in Company Stock ... without regard to (A) the diversification of assets of each Plan and Trust, (B) the risk profile of Company Stock, (C) the amount of income provided by Company Stock, or (D) the fluctuation in the fair market value of Company stock, unless State Street, using an abuse of discretion standard, determines from reliable public information that (i) there is a serious question concerning the Company's short-term viability as a going concern without resort to bankruptcy proceedings; or (ii) there is no possibility in the short-term of recouping any substantial proceeds from the sale of stock in bankruptcy proceedings.

(Agreement, p.  3)

Plaintiffs claim that on June 30, 2006 when State Street became the Fiduciary, GM was already in serious financial trouble.  (Complaint, ¶ 23)  By the time State Street assumed fiduciary responsibility for the GM stock in the Plans, numerous securities analysis and experts were already discussing a possible GM bankruptcy filing.  *Id.*  GM's financial condition continued to deteriorate throughout 2007 and the first Quarter of 2008 with a $39 billion Third Quarter 2007 loss.  *Id., ¶¶* 28, 30.  On July 15, 2008, GM Chief Executive Officer Rick Wagner announced that GM needed to implement a restructuring plan to combat Second Quarter 2008 losses that

4

he described as "significant" and to stem an impending liquidity crisis. *Id.,* ¶ 34. GM's financial condition continued to spiral out of control and on August 1, 2008, GM announced a Third Quarter 2008 net loss of $15.5 billion. *Id.*, ¶ 38. Analysts projected that GM was on track to run out of cash by the First Quarter of 2009. *Id.,* ¶ 39. In its November 10, 2008 Form 10-Q for the Third Quarter of 2008, GM acknowledged that its auditors had "substantial doubt" regarding GM's "ability to continue as a going concern." *Id.,* ¶ 46. In a November 2, 2008 notice to participants and beneficiaries, State Street temporarily suspended the purchases of the GM Common Stock Fund until further notice noting that "it is not appropriate at this time to allow additional investments by participants." *Id.*, ¶ 49. It was not until March 31, 2009 that State Street decided to divest the GM stock held in the fund, with the process completed by April 24, 2009. *Id.,* ¶ 51. Plaintiffs claim that State Street breached its fiduciary duty by failing to act in the face of an onslaught of red flags clearly indicating that GM stock was an imprudent investment causing the people who rely on the assets in the Plans to fund their retirement, to suffer hundreds of millions of dollars in losses. *Id.,* ¶ 52.

In its Opinion, the Sixth Circuit held that the presumption of reasonableness adopted in *Kuper v. Iovenko,* 66 F.3d 1447 (6th Cir. 1995) does not apply at the pleading stage and that Plaintiffs need not plead facts in their Complaint to overcome

the presumption.[1]   *Pfeil,* 671 F.3d at 592-93.   The Sixth Circuit noted that the complaint must plead facts to plausibly allege a fiduciary breached its duty to the plan, but that the complaint need not overcome the presumption of reasonableness in order to survive a motion to dismiss and that the presumption may be considered in the context of the record.   *Id.* at 596.   The Sixth Circuit also held that Plaintiffs pleaded sufficient facts to make plausible their claim of a causal link between State Street's conduct and the losses to the plan and that State Street cannot escape its duty simply by asserting at the pleadings stage that the plaintiffs themselves caused the losses to the plans by choosing to invest in the General Motors Common Stock Fund.   *Id.* at 597-98.   In addition, the Sixth Circuit held that Section 404(c) of ERISA, the safe harbor provision, an affirmative defense, may be raised as a defense on an individual basis at a later stage in the case, such as the class certification stage, but not on a motion to dismiss.   *Id.* at 601   The Sixth Circuit noted that Section 404(c), however, does not provide a defense to the selection of the menu of investment options that the plan will offer.   *Id.*   Finally, the Sixth Circuit held that Plaintiffs were not collaterally estopped from bringing the action based on the Second Circuit case, *Young v. General*

---

[1] The Supreme Court granted certiorari in a case from the Sixth Circuit, *Dudenhoeffer v. Fifth Third Bancorp.,* 692 F.3d 410 (6th Cir. 2012), on the issue of whether a plaintiff must allege facts in a complaint that a fiduciary abused its discretion by remaining invested in employer stock in order to overcome the presumption that the fiduciary's decision to invest in employer stock was reasonable.   *Fifth Third Bancorp. v. Dudenhoeffer,* 134 S.Ct. 822 (2013); Heard on April 2, 2014.

*Motors Investment Management Corp.,* 325 Fed. Appx. 31 (2d Cir. 2009) because State Street failed to show that the precise issue raised in the instant case was raised and actually litigated in the *Young* case. *Id.* at 601.

On remand, the parties agreed to certify the class. (Doc. No. 81) The Class Period in this case extends from July 15, 2008 to March 31, 2009.

The parties have now filed various motions, including cross-summary judgment motions. Responses and replies have been filed and a hearing held on the matter.

## II.   ANALYSIS

### A.   Standard of Review

Section 1132 is the civil enforcement provision of ERISA which states, "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).       In *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998), pursuant to a majority decision, the panel set forth "Suggested Guidelines" to adjudicate ERISA actions. The Sixth Circuit stated that the Rule 56 Summary Judgment procedure is "inapposite to the adjudication of an ERISA action" because of the Circuit's "precedents [which] preclude an ERISA action from being heard by

the district court as a regular bench trial." *Wilkins*, 150 F.3d at 619.[2] "[I]t makes little

sense to deal with such an action by engaging a procedure designed solely to

determine 'whether there is a genuine issue for trial.'" *Id.* The district court should

use neither the summary judgment nor the bench trial procedures in deciding ERISA

actions. *Id.* at 620. As to the merits of the case, the district court should conduct a

review based solely upon the administrative record and render findings of fact and

conclusions of law. *Id.* at 619. The discovery phase in an ERISA action will only

cover the exchange of administrative record, and, if there is a procedural due process

claim against the administrator, discovery is limited to evidence related to procedural

challenges. *Id.*

## B    Fiduciary Duty Standard

The main issue in this case is whether State Street's actions were consistent

with its duties under ERISA. Section 404(a)(1)(B) requires a retirement plan fiduciary

to discharge his duties with respect to the plan with care, skill, prudence and diligence

under the circumstances then prevailing that a prudent person acting in like capacity

and familiar with such matters would use in the conduct of an enterprise of like

character and with like aims. 29 U.S.C. § 1104(a)(1). The Sixth Circuit noted that the

---

[2] An ERISA claim is equitable in nature and is not eligible for a *jury* trial. *Wilkins*, 150 F.3d at 616, *citing Bair v. General Motors Corp.*, 895 F.2d 1094, 1096 (6th Cir. 1990).

fiduciary duties in Section 404 have three components. *Pfeil,* 671 F.3d at 590-91.
First, a fiduciary owes a duty of loyalty "pursuant to which all decisions regarding an
ERISA plan must be made with an eye single to the interests of the participants and
beneficiaries." *Id.* at 591. Second, ERISA imposes "an unwavering duty to act both
as a prudent person would act in a similar situation and with single-minded devotion
to the plan participants and beneficiaries." *Id.* And third, ERISA fiduciaries must act
for the exclusive purpose of providing benefits to plan participants and beneficiaries.
*Id.* Such duties charged to an ERISA fiduciary are the highest known to the law. *Id.*
ERISA holds a fiduciary who breaches any of these duties personally liable for any
losses to the plan that result from its breach of duty. *Id.* In an ESOP plan, such as this
case, an ESOP fiduciary may be liable for failing to diversify plan assets even where
the plan required that an ESOP invest primarily in company stock. *Id.* at 591.

> The Sixth Circuit has noted:

> In drafting the ESOP provisions of ERISA, Congress
> intended to encourage employees' ownership of their
> employer company. In order to promote this goal,
> Congress carved out specific exceptions to certain fiduciary
> duties in the case of an ESOP.

*Kuper,* 66 F.3d at 1458. "[A]s a general rule, ESOP fiduciaries cannot be held liable
for failing to diversify investments, regardless of whether diversification would be
prudent under the terms of an ordinary non-ESOP pension plan." *Id.* The Sixth

Circuit went on to note that,

> [A] proper balance between the purpose of ERISA and the
> nature of ESOPs requires ... a review [of] an ESOP
> fiduciary's decision to invest in employer securities for an
> abuse of discretion.  In this regard, we will presume that a
> fiduciary's decision to remain invested in employer
> securities was reasonable.

*Id.* at 1459 (adopting the standard set forth in *Moench v. Robertson,* 62 F.3d 553, 571 (3rd Cir. 1995)).  A plaintiff may rebut the "presumption of reasonableness" by showing "that a prudent fiduciary acting under similar circumstances would have made a different investment decision."  *Id.*  It will not be enough to prove that the stock was an unwise investment or that defendants ignored a decline in stock price. *In re General Motors ERISA Lit.,* 2006 WL 897444, *11 (E.D. Mich. Apr. 6, 2006).

To rebut this presumption, a plaintiff must show that the ERISA fiduciary could not have reasonably believed that the plan's drafters would have intended under the circumstances that the fiduciary continue to comply with the ESOP's direction that the fiduciary invest exclusively in employer securities.  *Kuper,* 66 F.3d at 1459.  "In determining whether the plaintiff has overcome the presumption, the courts must recognize that if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive."  *Id.* (citation omitted).  A proper balance between the purpose of ERISA and the nature of ESOPs requires that

10

an ESOP fiduciary's decision to invest in employer securities be reviewed for an abuse of discretion and that the fiduciary's decision to remain invested in employer securities is presumed reasonable. *Id.*

A fiduciary may breach its duties to plan beneficiaries by failing to investigate and evaluate the merits of its investment decisions. *Id.* The presumption of reasonableness is not rebutted if the defendant shows evidence that the stock fluctuated during a certain period and that several investment advisors recommended holding the stock. *Id.* at 1460. A fiduciary breaches its duty if it fails to impartially investigate the options by obtaining the impartial guidance of a disinterested outside advisor to the plan, apart from fiduciaries who also double as directors of the corporation. *Moench,* 62 F.3d at 572. Stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the ESOP fiduciary presumption of reasonableness. *In re General Motors ERISA Litigation,* 2006 WL 897444 at 10 (citing *Wright v. Oregon Mettalurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004)).

This Court must then determine how a "hypothetical prudent fiduciary" would have reacted if faced with the circumstances presented in this case. *Kuper v. Quantum Chemicals Corp.,* 852 F. Supp. 1389, 1397 (S.D. Ohio 1994). The prudent person standard is not concerned with results. *Id.* The Court must evaluate the fiduciary's

11

action "from the perspective of the 'time of the investment decision' rather than from 'the vantage of hindsight'." *Id.* (citations omitted).  A fiduciary meets ERISA's duty of prudence where the fiduciary utilized proper methods to investigate, evaluate and structure the investment, acted in a manner as would others familiar with such matters, and exercised independent judgment when making the investment decisions, at the time of the transaction.  *In re Iron Workers Local 25 Pension Fund,* 811 F. Supp. 2d 1295, 1317 (E.D. Mich. 2011).   Such a review of fiduciary actions is "highly deferential."  *Kuper,* 852 F. Supp. at 1397 (citations omitted).

### C.     Whether Plaintiffs rebutted the *Kuper/Moench* Presumption

The Sixth Circuit noted that Plaintiffs need not ultimately prove that July 15, 2008 was the actual date on which it was no longer reasonable to continue holding GM stock, only that the "imprudent date" for investment in GM stock occurred prior to March 15, 2009.  *See Pfeil,* 671 F.3d at 596, n. 3.  Plaintiffs identify four dates on which they claim it was an imprudent investment to continue to hold GM stock: July 15, 2008, September 22, 2008, November 21, 2008 and December 12, 2008.  (Doc. No. 92, Pg ID 2943)

Plaintiffs raise two reasons why Defendant breached its fiduciary duties: 1) State Street continued to hold GM stock long past the point when there was overwhelming evidence in the public domain raising serious question concerning

12

GM's short-term viability as a going concern without resort to bankruptcy proceedings, which rendered GM stock imprudent to hold as an investment in the Plans; and 2) State Street kept the GM Stock Fund invested in GM stock even though there was overwhelming evidence in the public domain raising a serious risk that GM's existing equity would be substantially diluted and stockholders' shares would be rendered essentially worthless even if GM received assistance from the federal government.  Plaintiffs assert there is no genuine issue of material fact with respect to either of these issues and as such, Plaintiffs are entitled to judgment in their favor. Plaintiffs' citation to facts in their brief is from their "Rule 56 Statement of Undisputed Facts in Support of Their Motion for Summary Judgment." (Doc. No. 92, Ex. 1)

State Street argues that Plaintiffs failed to rebut the presumption that its retention of GM stock was reasonable until its decision to sell the GM stock on March 31, 2009.  State Street claims that Plaintiffs' arguments are full of general statements about fiduciary duty and negative quotes from stock analyst reports, but say nothing about the weight courts give to a fiduciary's prudent process or about the sophisticated fiduciary process State Street followed with great care in this case.  State Street claims that Plaintiffs' argument that the circumstances surrounding GM were "more significantly dire here than in other cases where it was held that the alleged

circumstances were sufficient to rebut the presumption" and if these circumstances are not sufficiently dire to overcome the presumption, "it is not clear what would be sufficient," is more "rhetoric" than based on facts.  State Street argues that Plaintiffs' arguments, based on sufficiency of pleadings of a Rule 12(b)(6) motion, not the facts, fail to rebut the presumption that State Street's actions were reasonable in this summary judgment motion.

## 1.    July 15, 2008

Plaintiffs assert that it was imprudent for State Street to continue to hold GM stock in the Plans as of July 15, 2008 when GM's then-CEO Wagoner, announced that GM intended to implement a comprehensive restructuring plan in response to second quarter 2008 losses which Wagoner described "significant," and to stem "an impending liquidity crisis at GM."  (Doc. No. 92, Ex. 1, ¶ 26)  The restructuring plan was designed to bolster liquidity by $15 billion by the end of 2009.  It included the elimination of GM's dividends, and a 20% reduction in its salaried workforce, and significantly reduced truck and large vehicle production.  (*Id*., ¶ 27)  As of July 15, 2008, Plaintiffs claim that GM's liabilities already exceeded its assets by $56 billion and its restructuring plan was predicated on the improbable assumption that a company with a credit rating deep in junk territory would be able to raise another $4-7 billion through a combination of capital raising activities and asset sales in the midst

14

of the deepening financial crises. (*Id.*, ¶¶ 27, 35)

Plaintiffs further assert that financial analysts viewed this announcement as a red flag that GM was facing serious liquidity crisis that was turning into a "potential disaster for existing shareholders." (Doc. No. 92, Ex. 1, ¶ 28) Merrill Lynch noted that even if the plans succeed, the value of the stock had little chance of accruing to existing equity holders that will be crowded out or diluted over time. (*Id.*) Merrill Lynch further noted that some refer to the confluence of negative factors as the perfect storm or the 100 year flood, a potential disaster for existing shareholders. (*Id.*) A Deutsche Bank analyst expressed skepticism regarding GM's plans stating that the plans "overlook many factors that threaten the company's viability." (Doc. No. 92, Ex. 1, ¶ 29) Moody's warned that it might cut GM's already low Caa1 senior unsecured debt rating and Professor Edward Alman, the creator of Z-scores, a widely accepted predictor of corporate default, warned that GM's Z-score showed it was "on the verge of bankruptcy." (Doc. No. 92, Ex. 1, ¶ 30) Lehman Brothers also recognized that raising capital in the amount needed to stem GM's liquidity crisis "would lead to significant dilution for existing shareholders." (Doc. No. 92, Ex. 1, ¶ 34)

Plaintiffs claim that State Street's own internal analysis demonstrated that there was a "serious question" concerning GM's short-term viability as a going concern as

early as July 15, 2008. Plaintiffs claim that State Street's proprietary risk assessment model gave GM a score of 147.08 on a scale of 50 to 150, with 50 representing the least risk and 150 representing the most. (Doc. No. 92, Ex. 1, ¶¶ 31-33) Plaintiffs noted that Scott Roy, State Street's investment officer, freely admitted that GM's liquidity issues threatened its financial viability. (Doc. No. 92, Ex. 1, ¶ 33)

State Street argues that the notion that ERISA requires an ESOP fiduciary to liquidate company stock holdings based on a company's financial difficulties has been soundly rejected in comparable stock drop cases, citing *DiFelice v. U.S. Airways, Inc.,* 436 F. Supp. 2d 756, 784 (E.D. Va. 2006); *Summers v. UAL Corp.,* 2005 WL 2648670, *5 (N.D. Ill. Oct. 12, 2005). State Street cites the congressional record in support of its argument that the very reason Congress provided special statutory treatment of ESOP plans in ERISA was to relieve ERISA fiduciaries from being forced to close out the company stock fund in this sort of situation–"the goal is to create a plan which invests in employer securities for employees, not a plan which speculates in those securities–buying in order to sell and then selling in order to buy." 132 Cong. Rec. S7892-02, 1986 WL 776243 (Senator Russell Long, the primary Congressional proponent of ESOPS) (daily ed. June 19, 1986).

In addition to this important public policy, State Street asserts that Plaintiffs ignore the publicly known facts concerning GM available at the time, which were at

16

worst mixed and certainly did not compel a singular conclusion about GM's stock's future prospects.  State Street claims that in the days following the July 15, 2008 turnaround plan announcement, GM's stock price increased, 55.8% on July 23, 2008 from its July 14, 2008 closing price, and 48.6% increase from its July 15, 2008 closing price.  (Doc. No. 90, Ex. A, Lehn Report, ¶ 15) State Street argues that had it liquidated the Plans' GM stock on July 15, 2008 as argued by Plaintiffs, plan participants would have lost out on the ability to share in this increase.

State Street asserts that analyst reviews after GM's turnaround plan was announced were mixed throughout July and August.  In July, there was one buy, seven hold and six sell recommendations.  (Doc. No. 85, Sisk Decl., Ex. A-17) In August, there was one buy, six hold, and five sell recommendations.  (Doc. No. 85, Sisk Decl., Ex. A-18) State Street notes that pension plans and large institutional investors continued to invest in GM stock.  (Doc. No. 90, Ex. A, Lehn Report, ¶¶ 11-14) During the third quarter of 2008, investment banks Credit Suisse and Morgan Stanley purchased approximately 15 million and 4 million shares of GM stock, respectively.  (Doc. No. 90, Ex. A, Lehn Report, ¶ 13) State Street claims that at least one named plaintiff in this action increased his GM stock holdings during this period.  (Doc. No. 92, Ex. 1, ¶ 1) State Street argues that the evidence of up and down share prices, mixed analyst recommendations and continued participant investment is insufficient

17

to overcome the presumption of prudence.

Courts have found that negative earnings or analyst reports, and restructuring efforts are insufficient to rebut the presumption of prudence. *See In re WorldCom, Inc. ERISA Litigation,* 354 F. Supp. 2d 423, 449 (S.D. N.Y. 2005); *DiFelice,* 463 F. Supp. 2d at 784. Evidence of peaks and plateaus in stock prices, even if small and temporary, gives a fiduciary some objective indication that the stock may rebound sufficiently to recover at least some portion of ESOP losses. *Kuper*, 852 F. Supp. at 1397. Careful monitoring of the market performance of a stock would not have compelled a prudent investor to sell the stock at any particular point in time, so as to absorb the short-term losses rather than await a possible recovery. *Id.* Evidence of established and other impartial investment advisor reports issued during the relevant time periods encouraging investors to either buy or to continue to hold a stock would not compel reasonable persons to a singular conclusion about a stock's future prospects. *Id.* at 1398. A fiduciary cannot be said to have been objectively imprudent for having acted in the same manner as other impartial observers had recommended. *Id.* Evidence that at least a named plaintiff held the stock throughout the relevant time period, without attempting to liquidate or otherwise diversify his holdings over which they had some measure of control, is evidence that an adequate investigation conducted at that time would not have compelled a hypothetical prudent fiduciary to

18

liquidate or diversity the stock held in a plaintiff's ESOP account. *Id.*

Plaintiffs in this case submitted evidence as to GM's restructuring plan, that certain analysts' comments that GM's actions would lead to significant dilution for existing shareholders, and that there was serious question as to GM's short-term viability. State Street submitted evidence that the GM stock at least increased in the next couple of months after the plan was announced and other analysts had mixed reviews of the stock. State Street also submitted evidence that at least one named plaintiff purchased GM stock after the plan was announced. Given the overall circumstances on July 15, 2008, that GM stock prices increased shortly after the restructure plan announcement and that analysts were mixed in their recommendations, Plaintiffs have not carried their high burden to overcome the presumption that a hypothetical prudent fiduciary's decision not to liquidate the ESOP assets at that time was reasonable.

### 2.   September 22, 2008

Plaintiffs claim that GM's short-term viability as a going concern was more pronounced on September 22, 2008 after GM announced that it had drawn down the remaining $3.9 billion of its secured $4.5 billion credit facility. (Doc. No. 92, Ex. 1, ¶ 41) Plaintiffs assert that State Street's own expert, Martin Zimmerman, testified that once Lehman Brothers filed for bankruptcy on September 15, 2008, the capital raising

and asset sales contemplated by GM's July 15, 2008 restructuring plan were no longer possible, and obtaining some form of assistance from the federal government was GM's only hope for survival.  (*Id.*)  Plaintiffs assert that these events followed a dismal month in August for GM which began with an announcement on August 1, 2008 of a second quarter 2008 net loss of $15.5 billion.  (*Id.* at ¶ 37)  Plaintiffs claim that analysts began noting that GM was on track to run out of cash by the first quarter of 2009.   Plaintiffs note that State Street's own senior credit analyst, Jonathan Worraker, noted that it was estimated that GM would run out of money to conduct its operations in 2009. (*Id.* at ¶ 48)  Two weeks later on October 23, 2008, Worraker reiterated his concern. (*Id.* at ¶ 49) Susan Curtis, Investment Officer of  State Street, noted that the "perfect storm" existed.  (*Id.* at ¶ 50)

Plaintiffs indicate that following the second quarter 2008 earnings release, investors in Credit Default Swaps began pricing GM's probability of default at over 90 percent in the coming five years, noting that GM was going to file for bankruptcy. (*Id.* at ¶ 38) Plaintiffs claim that based on this evidence, no reasonably prudent fiduciary would have continued to hold GM stock on September 22, 2008.

State Street responds that through selective quotes from analyst reports that express concern over GM's future prospects, Plaintiffs attempt to distort the true picture of investor outlook on GM stock in the Fall of 2008.  State Street claims that

throughout this period, analyst outlook on GM remained neutral. The September 25, 2008 analyst reports included one buy, eight hold and four sell recommendations. (Doc. No. 85, Sisk. Decl., Ex. A-19) State Street asserts that market participants, including institutional investors and pension plans, continued to display confidence in GM. State Street claims that as of September 30, 2008, mutual funds continued to hold GM stock, including Dodge and Cox (53.3 million shares) and Brandes Investment Partners (36.8 million shares), along with investment banks of Credit Suisse (34.4 million shares) and Barclays Banks (25.7 million shares), among the five largest holders of GM stock. (Doc. No. 90, Ex. A, Lehn Report, ¶ 12) State Street also claims that some of the largest public pension funds continued to hold GM stock, such as the New York State Common Retirement System (3 million shares), the College Retirement Equities Fund (2.4 million shares) and the New York State Teachers' Retirement System (1.6 million shares). (Doc. No. 90, Ex. A, Lehn Report, ¶ 12)

The Court finds that based on the overall circumstances as of September 22, 2008, it cannot be said that a reasonable prudent fiduciary should have liquidated the ESOP at this date. State Street has submitted evidence of impartial investment advisor recommendations to hold, sell or buy and large investors continuing to hold GM stock. The evidence submitted by the parties does not show that there was a singular conclusion that holding GM stock was imprudent. Plaintiffs have not carried their

burden that State Street's failure to liquidate the GM stock on September 22, 2008 was not a reasonable prudent fiduciary decision.

### 3.      November 21, 2008

Plaintiffs assert that no later than November 21, 2008, a reasonable prudent fiduciary would have concluded that there was a serious question concerning GM's short-term viability as a going concern without resort to bankruptcy proceedings and that the information available to State Street "is nothing short of overwhelming" to support such a conclusion.  Plaintiffs claim that the annual automotive sales figures in October and November 2008 fell to just 10 million units, a level which it had not been seen since the early 1980s and far below the 14 million unit annual sales figure that had served as the foundation of GM's July 15, 2008 restructuring plan.  (Doc. No. 92, Ex. 1, ¶ 52) Plaintiffs further claim that on November 7, 2008, GM announced its third quarter 2008 financial report of $4.2 billion quarterly loss and warned that GM's estimated liquidity during the remainder of 2008 would approach the minimum amount necessary to operate its business.  (Doc. No. 92, Ex. 1, ¶ 54) In its third quarter 2008 Form 10-Q (Doc. No. 92, Ex. 1, ¶ 33) filing, GM indicated that its auditors had substantial doubts about GM's ability to continue as a going concern and that during the first two quarters of 2009, GM's estimated liquidity would fall significantly short of the minimum requirement to operate its business.  (Doc. No. 92,

Ex. 1, ¶ 55) . Plaintiffs point to State Street analyst Worraker's email to Curtis on November 10, 2008 indicating that GM was very nearly insolvent. Worraker noted GM's CFO's statements that unless GM gains access to capital markets or other forms of financing or government funding or a combination of these actions, during the first two quarters of 2009, GM's liquidity would fall short of the amount necessary to operate its business. (Doc. No. 92, Ex. 1, ¶ 56) Worraker further noted that it believed GM would file chapter 11 bankruptcy in the coming weeks or months if there is no government bailout. Even if GM received such a bail out, noting a lot of people indicated it would, Worraker stated that an increasing number of sell-side equity research analysts opined that GM's equity would be worthless under that scenario. (Doc. No. 92, Ex. 1, ¶ 56)

Plaintiffs assert that State Street itself finally drew the only reasonable conclusion from "this crescendo of bad news" when the Independent Fiduciary Committee voted to restrict new investment into the GM Stock Fund. (Doc. No. 92, Ex. 1, ¶ 59) Plaintiffs argue that State Street's decision not to offer plan participants new investment of GM stock also meant that by definition, GM stock was not a prudent investment to continue to hold. Plaintiffs claim that by holding GM stock after November 21, 1008, State Street breached its fiduciary duties in two separate and independent ways: first, because GM's short-term viability as a going concern without

resort to bankruptcy was indisputably in question, and second, because there was a serious risk that the value of GM's existing equity would be substantially diluted and rendered worthless even if GM received government aid.

State Streets argues that Plaintiffs' reliance on Worraker's email is unwarranted because it was an "informal" opinion and a single analyst's opinion cannot establish GM's stock was an imprudent investment. State Street claims that Worraker's email was not related to the Independent Fiduciary Committee's November 21, 2008 decision to stop offering GM stock. State Street asserts that Worraker's email was raised out of context. Worraker's comments were similar to many other analysts at that time that GM was experiencing financial difficulties, but also recognized that a government intervention could alleviate many of the temporary issues facing GM. At his deposition, Worraker testified that his statement was limited to a scenario in which GM did not obtain government loans. (Doc. No. 100, Ex. XX, pp. 38, 108) State Street claims one analyst's recommendation does not represent reliable information regarding a company's viability. State Street notes that as of November 21, 2008, the average IBES numeric rating on GM stock was 3.80, which is more closely aligned with a "hold" rating than with a "sell" rating. (Doc. No. 90, Ex. A, Lehn Report, ¶ 18) Analyst reports at that time were: one buy, eight holds, and four sells. (Doc. No. 85, Sisk Decl., Ex. A-22) State Street notes that in November 2008, actual large investors

increased their positions in GM stock. The State Retirement System of Ohio increased its holdings by 1.1 million shares, Vanguard increased its holdings by 6.2 million and Goldman Sachs increased its holdings by 3.2 million shares. (Doc. No. 85, Sisk Decl., Ex. A-22) State Street further notes that at least one pension fund, the Canadian Pension Plan Investment Board, initiated a new position to begin investing pension funds in GM stock during the fourth quarter of 2008. (Doc. No. 85, Sisk Decl., Ex. A-22)

Although GM's future without government intervention appeared bleak in November 2008 based on the submissions by Plaintiffs, it cannot be said that a reasonable prudent fiduciary should have liquidated the ESOP on November 21, 2008. State Street submitted evidence of impartial investment advisor recommendations to hold, sell or buy and large investors increasing their holdings of GM stock. Plaintiffs have not carried their burden that State Street's failure to liquidate the GM stock on November 21, 2008 was not a reasonable prudent fiduciary decision in light of the evidence submitted by the parties.

### 4.    December 12, 2008

Plaintiffs assert that it is unassailable that GM stock was an imprudent investment to hold in the fund by December 12, 2008 when State Street received a GM "business and liquidity" analysis from Stout Risius and Ross ("SRR"), its

financial adviser.  SRR indicated that GM was faced with significant solvency risk and could not access the credit markets or equity market to provide the necessary capital to sustain its operations.  SRR further indicated that even with a government bail out, the impact on GM stockholders in the form of dilution was likely going to be significant and that GM would also likely restructure its balance sheet, which would lead to further dilution to the current common shareholders.  GM's common stock had declined 80% over the last year, in addition to GM's publicly traded debt priced at approximately 20% of its par value.  (Doc. No. 92, Ex. 1, ¶ 72)

Plaintiffs noted that on the morning of December 12, 2008, State Street's Independent Fiduciary Committee voted to begin selling the GM stock with the minutes indicating that GM bonds were selling at 10 cents on the dollar.  (Doc. No. 92, Ex. 1, ¶¶ 70, 74) Ninety minutes later, the Independent Fiduciary Committee reversed itself based on a statement from the White House that it was considering using funds from the Troubled Asset Relief Program ("TARP") as a stop-gap measure to temporarily keep GM out of bankruptcy.  (Doc. No. 92, Ex. 1, ¶¶ 73-74) Plaintiffs claim that State Street's decision to reverse its decision to sell the GM stock without reading the SSR report and based on the White House's statement was imprudent. Plaintiffs argue that this was borne out by a Credit Suise analysis in a December 22, 2008 report indicating that even with concessions from the Union and bondholders,

26

GM may still end up in bankruptcy and the equity value of less than one dollar per share.  (Doc. No. 92, Ex. 1, ¶ 76)

State Street claims that Plaintiffs' assertion it was imprudent that State Street did not review the SRR report when it made its decision to reverse its earlier decision to sell the GM stock on December 12, 2008 is without merit because the author of the SRR report was present at both of its meeting held that day.  State Street further claims that the SRR report was irrelevant because State Street was monitoring on that day the issue of whether the government would provide interim support for GM. After the SRR report was drafted, the White House delivered a statement of its intent to support the automakers.  State Street argues that Plaintiffs' criticism of its reliance on the White House statement when it reversed its decision to sell GM stock is also without merit since State Street claims that the statement demonstrated a clear policy by the White House favoring government support of the automakers over bankruptcy. The White House indicated that it was disappointed that Congress failed to pass legislation to assist and restructure troubled automakers and although under normal economic conditions the White House preferred that markets determine the ultimate fate of private firms, it would consider other options, including the use of TARP funds to prevent the collapse of troubled automakers.  (Doc. No. 122, citing http://georgewbush-whitehouse.archives.gov/news/ releases/2008/12/20081212.html;

Doc. No. 90, Ex. D, Zimmerman Report, ¶ 27) State Street asserts that its decision to rely on the White House statement turned out to be correct in that on December 19, 2008, President George W. Bush authorized TARP fund loans to the automakers. GM obtained a commitment for $13.4 billion in government bridge loans and GM's stock experienced sizeable gains. (Doc. No. 90, Ex. D, Zimmerman Report, ¶ 29; Doc. No. 85, Sisk Decl., Ex. A-52) State Street claims that had it not reversed its decision from selling the GM stock on December 12, 2008, the ESOP would not have benefitted from the increase in the stock price and, perhaps State Street would have instead be defending a lawsuit by the same plaintiffs for liquidating the ESOP.

Based on the evidence submitted by the parties, the Court finds that Plaintiffs have not carried their burden to show that State Street's decision to reverse its decision from selling GM stock on December 12, 2008 was not reasonably prudent. As noted by the Sixth Circuit in *Kuper*, courts must recognize when determining whether a plaintiff has overcome the presumption that if a fiduciary does not maintain the investment in the employer's securities, it may face liability from the same plaintiffs if the employer's securities thrive. *Kuper*, 66 F.3d at 1459. It is this type of catch-22 situation that the Sixth Circuit directed the court to consider in weighing whether a fiduciary's decision to hold onto an employer's stock in an ESOP was prudent. On December 12, 2008, State Street reversed its decision to liquidate the

28

ESOP of GM stock after it determined that based on the White House announcement it appeared that the White House's policy would use other means, such as TARP funds, to prevent the automakers from failing as Congress had failed to pass legislation to assist the automakers. A reasonable prudent fiduciary faced with this same circumstances may have made the same decision as State Street. Plaintiffs have not carried their burden that a reasonable prudent fiduciary would have liquidated the GM stock in light of the White House policy announcement that it would assist the automakers despite Congress' failure to pass legislation that could have assisted the automakers.

### 5.     March 31, 2009/Process

Plaintiffs argue that State Street's failure to divest the GM stock until March 31, 2009 was imprudent. Plaintiffs assert that State Street should have sold the GM stock well before the March 31, 2009 date, noting the four dates above. Plaintiffs claim that State Street's reliance on "procedural prudence" argument is not a relevant inquiry because State Street's duty of prudence required it to sell the GM stock when it became imprudent to hold the stock, which in this case was when GM stock became at risk of becoming worthless in a restructuring plan. Plaintiffs assert that no matter how many meetings the Independent Fiduciary Committee held, it was required to divest under the terms of the engagement agreement. Plaintiffs claim that the

members of the Independent Fiduciary Committee did not expend the time and effort necessary to learn their responsibilities under the Plans because each were responsible for monitoring approximately 75 stocks, including the GM stock. (Doc. No. 114, Ex. 10, Driscoll Tr., pp. 121-22) Plaintiffs assert that the Independent Fiduciary Committee used the wrong standard as to the GM stock. The terms of the Plans documents required State Street to determine whether there was a "serious question" concerning GM's short-term viability and if so, to divest the stock. (Doc. No. 92, Ex. 1, ¶¶ 14-17) Instead, Plaintiffs claim the Independent Fiduciary Committee required bankruptcy to be "certain," "clear," or "imminent" in order for State Street to divest. (Doc. No. 114, Exs. 34-36) Plaintiffs claim that by substituting a far higher standard for divesting GM stock than the standard set forth in the Plan documents, State Street breached its fiduciary duty and exposed the participants in the Plans to far more risk than was prudent or contractually allowed.

State Street asserts that its decision to hold onto the GM stock until March 31, 2009 was not unreasonable. As a condition of the TARP fund loans of $17.4 billion for both GM and Chrysler authorized by President Bush, GM and Chrysler agreed to present revised restructuring plans to the Treasury by February 17, 2009. (Doc. No. 90, Ex. D, Zimmerman Report, ¶¶ 25-29) Between December 31, 2008 and January 14, 2009, GM's stock price had climbed 21%. (Doc. No. 85, Sisk Decl., Ex. A-52)

30

On February 15, 2009, President Barack Obama established the Presidential Task Force on the Auto Industry to review the automakers' revised restructuring plans. GM submitted its plan on February 17, 2009. The Independent Fiduciary Committee met on February 18, 20 and 23 to discuss the GM plan. (Doc. No. 85, Sisk Decl., Exs. A-56, A-58, A-59) The GM plan indicated that bankruptcy would present significant systemic risk to the auto industry and would cost the government much more than the requested $30 billion in government aid. The GM plan did not contemplate bankruptcy and did not propose elimination of outstanding common stock of GM. GM instead assumed a 3 to 1 debt-equity swap with the bondholders and a funding of 50% of a Voluntary Employee Beneficiary Association Trust ("VEBA") to finance union retiree benefits with GM stock. (Doc. No. 90, Ex. D, Zimmerman Report, ¶¶ 30-35) The Independent Fiduciary Committee after reviewing GM's plan noted that GM showed significant progress in meeting the objectives set by the Treasury Department. (Doc. No. 85, Sisk Decl., Ex. A-56)

The Independent Fiduciary Committee met on March 5, 2009 after GM filed its annual 10-K with the Securities and Exchange Commission and again on March 12, 2009 after GM announced it would not need the requested $2 billion loan installment for March. (Doc. No. 85, Sisk Decl, Exs. A-63, A-64) SRR presented its analysis of GM's February 17, 2009 restructuring plan which was discussed by the

Independent Fiduciary Committee on March 18 and 25, 2009. (Doc. No. 85, Sisk
Decl., Exs. A-65-A-67) The SRR report noted that if the GM plan was implemented,
GM stock would not be eliminated and could be valued at $.40 to $1.00 per share.
(Doc. No. 85, Sisk Decl., Ex. A-66)

On March 30, 2009, the Auto Task Force released its evaluation of the GM
restructuring plan which the Task Force found to be incomplete and, for the first time,
raised the possibility of a bankruptcy filing to resolve the issues with GM bondholders
and the UAW who had not agreed with GM on the terms of restructuring. (Doc. No.
85, Sisk Decl., Ex. A-68) The Independent Fiduciary Committee met twice that day.
At the first meeting, the Independent Fiduciary Committee was informed that the Task
Force did not find GM's restructuring plan viable, giving GM 60 days to develop a
different plan. (Doc. No. 85, Sisk Decl., Ex. A-69) The Independent Fiduciary
Committee later met that day to discuss the market price for the GM stock, which was
currently at $2.70 per share and although some members thought that a GM
bankruptcy was not imminent based on the price, the rejection of GM's plan increased
the likelihood of bankruptcy. (Doc. No. 85, Sisk Decl., Ex. A-69)

The Independent Fiduciary Committee agreed to meet the next day, March 31,
2009 to continue its discussion. At that meeting, the Independent Fiduciary
Committee concluded that the government rejection of the GM restructuring plan

32

presented sufficient information that GM stock was no longer a prudent investment for the ESOP.  (Doc. No. 85, Sisk Decl., Ex. A-71) The Independent Fiduciary Committee then instructed the Company Stock Group to begin selling the GM stock held in the Plans and such sale was completed on April 24, 2009.  GM filed for bankruptcy on June 1, 2009.

State Street argues that it discharged its fiduciary responsibilities through a three tier decision making process.  (Doc. No. 85, Sisk Decl., ¶ 2) The first level of the process includes the Company Stock Group monitoring and reviewing all employer securities in its clients' accounts daily based on established objective criteria and appropriate facts and circumstances.  The Company Stock Group identifies employer securities for additional review by the Stock Review Committee, which is the second level of monitoring and review.  An investment officer presents a written report to the Stock Review Committee on the latest developments at least once a month and more frequently as necessary.  Both the Stock Review Committee and the Company Stock Group provide the due diligence, analysis, review and investment input to the Independent Fiduciary Committee–the third level of fiduciary monitoring. The Independent Fiduciary Committee makes the final fiduciary decisions pertaining to investment management assignments. (Doc. No. 85, Sisk Decl., ¶¶ 3-6)

State Street notes that courts who have reviewed its process have concluded that

33

its monitoring process satisfies ERISA's requirements and that State Street has fulfilled all of its obligations and understood its fiduciary duties, citing *In re Delphi Corp.,* 602 F. Supp. 2d at 815-16 (granting summary judgment for State Street with a discussion of State Street's monitoring process), *Bunch v. W.R. Grace & Co.,* 555 F.3d 1, 9-10 (1st Cir. 2009)(affirming summary judgment for State Street and finding that its process left little doubt that the employer's corporate health was thoroughly studied by the experts); and *Summers v. UAL Corp.,* 2005 WL 2648670, at *6 (N.D. Ill. Oct. 12, 2005)(the evidence showed that State Street fulfilled all of its obligations and understood its fiduciary duties).

State Street claims that it followed the monitoring process all throughout the Class Period. The Company Stock Group monitored GM on a daily basis and regularly reported to the Stock Review Committee, including monthly written reports. As issues concerning the GM stock increased, the responsibility for exercising oversight over the GM stock was elevated to the Independent Fiduciary Committee. The Independent Fiduciary Committee held 43 meetings during the Class Period to discuss the GM stock and whether to retain the stock. In addition to internal State Street advisors, the Independent Fiduciary Committee obtained written and oral advice from outside legal and financial advisors. State Street asserts that the contemporaneous reports and volumes of meeting minutes demonstrate that State

34

Street did exactly what ERISA required of a prudent fiduciary.  (Doc. No. 85, Sisk Decl., ¶¶ 7-8)

Based on this monitoring process during the Class Period, the Independent Fiduciary Committee decided to continue the suspension of further purchases of GM stock on November 11, 2008, liquidate the ESOP's holdings in GM stock on the morning of December 12, 2008 when available public information indicated there would be no government aid to support GM, reverse its decision later on December 12, 2008 in light of statements by the White House and the Treasury Department regarding government support, and sell the ESOP's GM stock holdings on March 31, 2009 based on public information that day.

State Street argues that it did not fall asleep at the wheel during the Class Period, but that the evidence shows it was focused on GM and its stock as required by ERISA.  State Street argues that an ERISA fiduciary is required to follow a prudent process, not a certain outcome.  State Street claims it did not abuse its discretion when it held on to the stock until March 31, 2009.  State Street argues that Plaintiffs failed to carry their high burden to overcome the presumption that State Street's decision was prudent.

State Street argues that Plaintiffs would like the Court to ignore the importance of its process because they cannot rebut the evidence of State Street's thorough and

careful process as a fiduciary.  State Street claims it did not use the wrong standard as argued by Plaintiffs because the Fiduciary Services portion fo the Agreement states that State Street had the "exclusive authority" to determine if GM company stock "continues to be a prudent investment."  (Doc. No. 85, Sisk Decl., Ex. A-3)

As this Court noted above, a fiduciary's decision in an ESOP case is presumed to be reasonable; a plaintiff may rebut the "presumption of reasonableness" by showing "that a prudent fiduciary acting under similar circumstances would have made a different investment decision."  The Agreement between GM and State Street gave State Street the exclusive authority to determine whether GM stock continued to be a prudent investment.  Reviewing the arguments and documents submitted by the parties, this Court is unable to conclude that State Street's decision not to divest the stock until March 31, 2009 was an imprudent decision in light of the presumption of reasonableness standard.  Plaintiffs have not carried their burden to rebut this presumption.  Although Plaintiffs make light of State Street's "procedural process" in reviewing the status of GM stock, the evidence submitted, including the number of meetings the Independent Fiduciary Committee held during the Class Period shows that State Street was prudent and deliberate in its decision making.  Analysts during the Class Period were mixed as to whether to buy, hold or sell the GM stock.  Large investors during the Class Period continued to hold GM stock and, in some instances,

increased their holdings of GM stock.  It was not until March 31, 2009 that State Street determined that there were no other options, other than bankruptcy, in order for GM to move forward as a going concern.  State Street's decision on March 31, 2009 to begin divesting the GM stock came after the Auto Task Force and the White House rejected GM's restructuring plan on March 30, 2009, was that of a reasonable prudent fiduciary.  Summary judgment must be entered in favor of Defendant State Street and against Plaintiffs.

## III.   CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendant State Street's Motion for Summary Judgment (**Doc. No. 84**) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (**Doc. No. 92**) is DENIED.

IT IS FURTHER ORDERED that this action is DISMISSED with prejudice.


Dated:  April 11, 2014              S/Denise Page Hood
                                    Denise Page Hood
                                    United States District Judge

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 11, 2014, by electronic and/or ordinary mail.

                                    S/Julie Owens for LaShawn R. Saulsberry
                                    Case Manager

37